*In re:*

Solicitud al Consejo de Edu-
cación Superior para
el Estudio y Evaluación
de la Enseñanza del De-
recho en las Escuelas de
Derecho de Puerto Rico.

RESOLUCIÓN

San Juan, Puerto Rico, a 11 de marzo de 1969

POR CUANTO: Con relación a los graduados de escuelas puertorriqueñas de Derecho acreditadas por este Tribunal y por el Consejo de Educación Superior el resultado de los exámenes de reválida celebrados por la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía señala un alto porcentaje de suspendidos, así como un promedio general bajo, según aparece de los anexos 1 y 2 que se acompañan y hace formar parte de esta resolución.

POR CUANTO: La situación apuntada puede obedecer a que las escuelas de Derecho de Puerto Rico no responden a las normas de capacitación y eficiencia necesarias, tanto en los aspectos orgánicos y funcionales de dichas instituciones, tales como la idoneidad y composición de la facultad, el programa de estudios, su contenido, distribución y evaluación académica, así como en otros aspectos relativos a su organización o funcionamiento.

POR CUANTO: El Consejo de Educación Superior, por su preeminencia dentro del sistema educativo y la disponibilidad de los medios técnicos a su alcance, está en una posición rectora que le permite realizar la evaluación de las instituciones de enseñanza del Derecho acreditadas por este Tribunal.

863

POR TANTO: Se solicita del Consejo de Educación Superior que realice un estudio de la enseñanza del Derecho en las escuelas de Derecho de Puerto Rico y nos informe sus resultados para el ulterior uso que estime apropiado este Tribunal.

Lo acordó el Tribunal y firma el Señor Juez Presidente, quien expondrá por separado las razones de su concurrencia en esta resolución. El Juez Asociado Señor Blanco Lugo expondrá también por separado las razones para su concurrencia en la misma. El Juez Asociado Señor Santana Becerra disiente en voto separado que se une a esta resolución y en el cual concurre el Juez Asociado Señor Hernández Matos.

(Fdo.) Luis Negrón Fernández
*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos
*Secretario*

Anexo 1

## RELACION ENTRE APROBADOS Y SUSPENDIDOS, POR UNIVERSIDAD
## REVALIDAS DE SEPTIEMBRE 1966 A SEPTIEMBRE 1968

| UNIVERSIDAD | Septiembre 1966 | | | | | Marzo 1967 | | | | | Septiembre 1967 | | | | | Marzo 1968 | | | | | Septiembre 1968 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aprobados | | Suspendidos | | Total Examinados | Aprobados | | Suspendidos | | Total Examinados | Aprobados | | Suspendidos | | Total Examinados | Aprobados | | Suspendidos | | Total Examinados | Aprobados | | Suspendidos | | Total Examinados |
| | Número | % del Total | Número | % del Total | | Número | % del Total | Número | % del Total | | Número | % del Total | Número | % del Total | | Número | % del Total | Número | % del Total | | Número | % del Total | Número | % del Total | |
| U. P. R. | 47 | 54 | 40 | 46 | 87 | 43 | 75 | 14 | 25 | 57 | 65 | 72 | 25 | 28 | 90 | 33 | 73 | 12 | 27 | 45 | 46 | 49 | 48 | 51 | 94 |
| Interamericana | 6 | 11 | 48 | 89 | 54 | 22 | 34 | 43 | 66 | 65 | 15 | 22 | 54 | 78 | 69 | 24 | 30 | 55 | 70 | 79 | 14 | 18 | 62 | 82 | 76 |
| Católica | 7 | 15 | 39 | 85 | 46 | 16 | 42 | 22 | 58 | 38 | 13 | 22 | 46 | 78 | 59 | 11 | 24 | 34 | 76 | 45 | 8 | 10 | 73 | 90 | 81 |
| Estados Unidos | 7 | 64 | 4 | 36 | 11 | 4 | 57 | 3 | 43 | 7 | 5 | 63 | 3 | 37 | 8 | | | 2 | 100 | 2 | 2 | 50 | 2 | 50 | 4 |
| España | | | 15 | 100 | 15 | | | 12 | 100 | 12 | 3 | 14 | 18 | 86 | 21 | | | 19 | 100 | 19 | | | 21 | 100 | 21 |
| Cuba | | | | | -- | | | | | -- | 1 | 50 | 1 | 50 | 2 | | | | | -- | | | | | -- |
| Total | 67 | 31 | 146 | 69 | 213 | 85 | 47 | 94 | 53 | 179 | 102 | 41 | 147 | 59 | 249 | 68 | 36 | 122 | 64 | 190 | 70 | 25 | 206 | 75 | 276 |

Fuente de Informacion:  Oficina de Estadísticas, Tribunal Supremo

865

## CALIFICACIONES PROMEDIO, POR UNIVERSIDAD
## REVALIDAS DE SEPTIEMBRE 1966 A SEPTIEMBRE 1968

| UNIVERSIDAD | PROMEDIOS | | | | | |
|---|---|---|---|---|---|---|
| | Septiembre 1966 | Marzo 1967 | Septiembre 1967 | Marzo 1968 | Septiembre 1968 | Todas |
| U. P. R. | 99.95 (87) | 104.58 (57) | 101.70 (90) | 102.71 (45) | 101.2 (94) | 101.7 (373) |
| Interamericana | 78.92 (54) | 87.00 (65) | 79.97 (69) | 88.55 (79) | 86.0 (76) | 84.4 (343) |
| Católica | 82.76 (46) | 93.08 (38) | 81.06 (59) | 82.11 (45) | 86.2 (81) | 84.8 (269) |
| Estados Unidos | 99.35 (11) | 100.00 (7) | 94.88 (8) | 84.63 (2) | 102.9 (4) | 97.9 (32) |
| España | 66.97 (15) | 67.79 (12) | 64.65 (21) | 74.09 (19) | 66.4 (21) | 67.9 (88) |
| Cuba | | | 96.00 (2) | | | |
| Total | 88.55 (213) | 93.11 (179) | 87.40 (249) | 38.89 (190) | 90.0 (276) | 89.4 (1105) |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

Nota: 1) 180 puntos es la puntuación total del examen
2) Las cifras en paréntesis corresponden al número de examinados

—O—

Voto Disidente del Juez Asociado Señor Santana Becerra en el cual concurre el Juez Asociado Señor Hernández Matos.

San Juan, Puerto Rico, 11 de marzo de 1969

Motivada en el hecho de que los exámenes de reválida de graduados de las escuelas de Derecho puertorriqueñas señalan un alto porcentaje de suspendidos, y partiendo del supuesto de que ese hecho "puede obedecer a que las escuelas de Derecho de Puerto Rico no responden a las normas de capacitación y eficiencia necesarias", la mayoría del Tribunal ha adoptado una Resolución solicitando al Consejo de Educación Superior que realice un estudio de la enseñanza del Derecho en las escuelas de Derecho de Puerto Rico, e informe sus resultados para "el ulterior uso que estime apropiado este Tribunal".

Consciente de la magnitud del problema creado con el desproporcionado alto porcentaje de fracasos que acusan las últimas cinco pruebas de reválida para el ejercicio de la profesión de abogado; consciente, además, de la responsabilidad que me corresponde como Juez Asociado del Tribunal que designa la Junta de examinadores que preparan, corrigen y califican los exámenes, creo mi deber el hacer expresión del porqué no suscribo la Resolución del Tribunal.

—I—

En primer lugar, al hacer la encomienda la Resolución de la mayoría parte de un supuesto que no contiene todos los factores concurrentes que puedan haber dado lugar a la existencia del problema, y presenta un solo aspecto de entre los muchos factores que puedan haber contribuido a la situación creada, sin que aún se hayan excluido, tras un estudio y análisis, esos otros factores.

Un enfoque más equilibrado de la situación requiere algunas consideraciones, a saber:

(a) En la década de 1940 a 1950 se examinaron 397 personas y aprobaron 299, un promedio de 75.4% de aprobación.

(b) En la década de 1950 a 1960 se examinaron 683 abogados. Aprobaron 531, para un promedio de 78% de aprobación.

(c) En las reválidas de febrero de 1961 a marzo de 1966, inclusive, se examinaron 1039 aspirantes. Aprobaron 787, un promedio de 76% de aprobados en esas once reválidas.

Este período empieza ya a reflejar el aumento de aspirantes. El por ciento mayor de aprobación fue el de la reválida de septiembre de 1964 con 94.3% y una concurrencia de 141 examinandos. El más bajo el de la reválida de marzo de 1966 con 54.4% y una concurrencia de 112.

(d) Hasta este momento el sistema de reválida consistía de un examen escrito y otro oral. En ocasiones, el que obtuviera en el examen escrito una calificación mínima fijada por el Tribunal se le eximía del examen oral y quedaba aprobado. La calificación mínima de ordinario era 75, aunque en alguna ocasión pudo ser 70. Los exámenes escritos duraban dos días.

(e) Comenzando con la reválida de septiembre de 1966 se implantó un nuevo sistema de examen. Se eliminó el oral, y el escrito se fijó de 18 preguntas básicas, con un valor de puntuación total de 180 puntos, sobre cada una de 15 materias requeridas y 3 de seis materias opcionales. El Tribunal fijó por reglamento una nota de pase de 60. En consecuencia, cada aspirante debía acumular un mínimo de 108 puntos para obtener su aprobación.

(f) A la reválida de septiembre de 1966, primera bajo

el nuevo sistema implantado, acudieron 213 aspirantes. Obtuvieron su título 67, un 31%.

(g) A la reválida de marzo de 1967, acudieron 179 examinandos. Obtuvieron el título 85, el 47.4%.

(h) En la reválida de septiembre de 1967 se examinaron 249. Aprobaron 102, un 40.9%.

(i) En la reválida de marzo de 1968 se examinaron 190 graduados. Obtuvieron su título 68, el 35.7%.

(j) En la reválida de septiembre de 1968 se examinaron 276. Obtuvieron su título 70, el 25.3%.

(k) Una fiel exposición de los hechos para que se tenga la exacta dimensión del problema para cuando, y por quienes corresponda pasar juicio sobre el mismo en forma objetiva, exige que exponga los siguientes hechos adicionales:

(1) De los 67 aspirantes que quedaron aprobados en la reválida de septiembre de 1966, un número menor obtuvo, al corregirse sus papeles de examen, la puntuación mínima de 108. Ponderando ciertos factores, la Junta consideró una nota de pase menor de la reglamentaria, hecho que fue ratificado y aceptado por el Tribunal. A base de la puntuación mínima de 108, el 31.4% de aprobación fue menor.

(2) De los 85 que fueron aprobados en la reválida de marzo de 1967, un número menor obtuvo, al corregirse sus papeles de examen, la puntuación mínima de 108. Con la previa autorización del Tribunal, y hasta donde llega mi conocimiento, la Junta siguió un proceso similar. A base de la puntuación mínima de 108, el 47.4% de aprobación fue menor.

(3) De los 102 aprobados en la reválida de septiembre de 1967, 43 obtuvieron al corregirse sus papeles de examen, la puntuación mínima de 108. Ponderando ciertos factores, el Tribunal propio hizo el reajuste hasta donde quedaron aprobados.

(4) De los 68 que fueron aprobados en la reválida de marzo de 1968, 31 obtuvieron, al corregirse sus papeles de examen, la puntuación mínima de 108. Ponderando iguales factores, el Tribunal hizo el reajuste hasta la aprobación de 68.

(5) De los 70 que fueron aprobados en la reválida de septiembre de 1968, 49 obtuvieron, al corregirse su examen, la puntuación mínima de 108. Por un proceso similar de ponderación de ciertos factores por el propio Tribunal, se aprobaron 70.

(6) Al igual que en las reválidas de septiembre de 1966 y marzo de 1967, los por cientos de aprobación de las últimas tres, de 40.9%, 35.7% y 25.3%, respectivamente, fueron menores a base de la puntuación real de 108. Dichos por cientos de aprobación, a base de la puntuación mínima de 108, fueron el 17.3% para la reválida de septiembre de 1967; 16.8% en la de marzo de 1968 y 17.7% en la de septiembre, 1968.

(7) Es un hecho cierto que debo exponer, en parte por las especulaciones equivocadas y sin base que se han hecho en fuentes de afuera ante la falta de conocimiento del proceso seguido, que tanto por la Junta, como por el Tribunal, el proceso de reajuste ha respondido a una ponderación racional de factores envueltos, aplicable por igual a *todos* los examinandos, y beneficiándolos por igual a *todos* en sus respectivas puntuaciones.

(*l*) El problema confrontado es uno que trasciende el ámbito estrecho del interés de una clase profesional, con el Tribunal Supremo en la función otorgádale por Ley de establecer el mecanismo de prueba. El problema está investido de un gran interés público y social. Otros poderes públicos, el Senado de Puerto Rico, ha sentido una legítima preocupación con el mismo. Están envueltos cuantiosos intereses materiales, las inversiones hechas para obtener una educación

legal. Está envuelto el valor del tiempo invertido, y hay envuelto, quizás el más importante, un interés espiritual, deseos de progresar y mejorarse, de ser de mayor utilidad en la escala de los valores comunales.

(m) En el descargo de la responsabilidad que me corresponde en todo este problema debo rechazar, por no hallarle fundamento en los hechos, las especulaciones equivocadas que se han dejado expresar en otras esferas en el sentido de que toda esta situación puede ser resultado de un interés de clase profesional en restringir la entrada a la matrícula de abogados. La falta de información de hechos, y el no haber conocido un examinado, hasta la última reválida, la puntuación obtenida por él de modo de evaluarse a sí mismo, así como el no tener acceso a sus papeles de examen explican, hasta cierto punto, que haya habido margen para la especulación. Repito que no le encuentro base en los hechos.

Sería poco sabio tal política profesional. Nuestra sociedad conoce del dolor de la escasez de médicos. La intervención mayor del Gobierno en los problemas sociales a través de legislación cubriendo aspectos que antes se creían sólo de la incumbencia privada; las más recientes decisiones constitucionales en cuanto a la protección más extensa de las libertades civiles mediante la mayor intervención de abogados; el explosivo crecimiento de los asuntos judiciales y el mayor conocimiento de la ley y del derecho aun en esferas administrativas que hoy se impone, harían de una escasez de abogados admitidos al ejercicio de la profesión un problema social crítico en que, al igual que con el problema de la profesión médica, vendrían a ser en última instancia los indigentes y desvalidos, los menos pudientes, los que habrían de sufrir el problema social que se creare.

(n) No es mi misión aquí enjuiciar y hacer conclusiones sobre el sistema de examen actual. Señalo el hecho irrefutable que, coincidiendo con el advenimiento del actual sistema

de examen, los hechos señalan la inversión de los por cientos tradicionales de aprobación y desaprobación. El por ciento promedio de 76.6% de aprobación anterior se torna en un 36.1% bajo el nuevo sistema después de los ajustes mencionados, y el promedio de desaprobación anterior de 23.4% se convierte en 63.9% a pesar de dichos ajustes.

(o) No suscribo la Resolución del Tribunal porque ignora todos los demás factores concurrentes, que como expresé antes, no han sido excluidos como causa del problema tras un debido análisis, y porque la Resolución parte de un supuesto que sugiere fuertemente la incompetencia o ineficiencia de las escuelas de Derecho puertorriqueñas y que, en desconocimiento de los hechos que he relatado, crea en la opinión pública una sensación de tal incompetencia o ineficiencia y, por ende, de la ineficiencia e incapacidad de los examinados.

Ni la Ley sobre admisión al ejercicio de la abogacía, ni este Tribunal por Reglamento, han pre-establecido normas objetivas que sirvan de guía en la designación de los abogados nombrados para la Junta. Repito que no estoy enjuiciando ni haciendo conclusiones, pero la ausencia de tales guías pre-establecidas puede haber dado lugar a la designación de Juntas en forma que no sea la más representativa de un sector promedio de la profesión legal. Por lo menos éste debe ser un aspecto a evaluarse.

(p) El hecho que a solicitud reciente de la Junta el Tribunal encomiende a una organización de los Estados Unidos —en donde no coexisten, como aquí, las dos grandes fuentes de jurisprudencia occidental—el hacer una evaluación del sistema de examen sin implicación alguna de que el sistema pueda ser también causa del problema, no desvirtúa la conclusión a que he llegado sobre la Resolución.

—II—

Mi segundo motivo de desacuerdo reside en la forma de la encomienda. El Consejo de Educación Superior es el orga-

nismo rector de una de las tres escuelas de Derecho concernidas. No es probable que el Consejo mismo realice la labor y habrá de delegarla en el cuerpo de estudio apropiado. En el año 1961, cuando el Consejo consideraba la acreditación de la Escuela de Derecho de la Universidad Interamericana, se delegó en un organismo de evaluación compuesto mayormente por catedráticos de la propia Escuela de Derecho de la Universidad de Puerto Rico, con su Decano como asesor de dicho organismo. El informe adverso a la Escuela de Derecho de la Universidad Interamericana rendido en ese entonces por el organismo designado no me pareció lo objetivo y justo que debiera ser. Véase mi Voto en 88 D.P.R. 932.

Al disponer la mayoría del Tribunal que el Consejo informe el resultado de su estudio "para ulterior uso que estime apropiado este Tribunal" no se excluye que el informe sirva para denegar admisión a examen a graduados de algunas de las escuelas puertorriqueñas de Derecho. Según interpreto la ley vigente para la admisión al ejercicio de la profesión de abogados, los graduados de la Universidad de Puerto Rico deben ser siempre admitidos a examen. Nunca los graduados de la Universidad de Puerto Rico han sido rechazados para admisión a examen, y sería ingenuo esperar que el Estado no admitiera a examen a los abogados titulados por el propio Estado.

Todo lo anterior indica que las escuelas de Derecho más afectadas serían la de la Universidad Interamericana y la de la Universidad Católica. En las circunstancias expuestas, creo más justo, más democrático y más imparcial el que cualquier estudio o evaluación que se desee sea encomendado a un organismo *ad hoc* que contenga representación equitativa de las tres facultades de Derecho, y representación del Colegio de Abogados.

Creo igualmente más razonable el que este organismo conozca y analice el problema en su integridad, tanto la pre-

paración de los aspirantes como el sistema de examen a que son sometidos.

Por las razones expuestas, dejo para el récord este voto disidente.

—o—

Voto del Juez Asociado Señor Blanco Lugo.

San Juan, Puerto Rico, a 21 de marzo de 1969

De rigor es repetir las palabras del Juez Presidente Señor Negrón Fernández en su voto disidente sobre la admisión a examen de reválida de los graduados de la Universidad Interamericana: "Hemos comprometido peligrosamente el sentido de nuestra responsabilidad institucional al prescindir— sin medios ni instrumentos para determinarlas por nosotros mismos—de las normas promulgadas bajo autoridad de ley por el organismo facultado para medir los valores de capacidad y eficiencia de las escuelas de Derecho en Puerto Rico [se refería al entonces Consejo Superior de Enseñanza]." *In re Calderón Lassén,* 88 D.P.R. 931, 934 (1963). Para no incurrir nuevamente en esa actitud lesiva a la responsabilidad que debe informar las actuaciones de este Tribunal en lo que se refiere a la capacitación de quienes ejercerán la profesión de abogado, y vislumbrándose ya que no era ilusorio el presagio de "un deterioro en la calidad de la educación legal en Puerto Rico" a que aludí en mi voto disidente en la misma ocasión, *In re Calderón Lassén,* supra, a la pág. 940, es indispensable que se estudie y reevalúe la enseñanza del Derecho en Puerto Rico. Sólo así podremos actuar en el futuro con suficientes elementos de juicio, en forma puramente objetiva, con desconocimiento de premisas inarticuladas, y con la contribución de criterios pertinentes al problema que confrontamos.

Somos depositarios de la confianza pública en la importante misión de autorizar el ejercicio de la abogacía. Frente

a los problemas individuales que pueden existir debido *a los frecuentes fracasos de los mismos aspirantes* está la responsabilidad contraída con la comunidad de que se le garantice que quienes han de aconsejar sobre la libertad, la hacienda y una infinidad de relaciones sociales y económicas tengan, cuando menos, una preparación mínima y suficiente.

—1—

Un análisis superficial de los resultados de los últimos exámenes y la comparación con los obtenidos bajo el sistema anterior a septiembre de 1966—sistema que descartamos, entre otras cosas, por la falta de uniformidad en sus normas y otros defectos atribuibles a la mudable composición de la junta examinadora(1)—no contribuyen a despejar la situación en forma que permita apreciar claramente las conclusiones que surgen. No basta con indicar, sin más, apoyándose

(1) Por resolución de 11 de febrero de 1966 al considerar el informe sobre el Tribunal Supremo rendido por el Comité para el Estudio y Evaluación del Sistema Judicial, acordamos:

"Considerado el crecido número de aspirantes al ejercicio de la abogacía *y que el examen escrito es el mejor medio disponible para determinar bajo normas de igualdad la capacidad de los aspirantes,* se solicita de la Asamblea Legislativa que se enmiende el inciso 5 de la Ley Núm. 17 de 10 de junio de 1939, 4 L.P.R.A. 721, a los fines de que se requiera que el

solicitante sufra un examen en la fecha, forma y extensión que el Tribunal Supremo establezca, eliminando la referencia a que el mismo deberá ser 'escrito y oral'." (Énfasis nuestro.)

Bajo el sistema anterior al presente, las normas y criterios de cada junta eran tan distintos que, con referencia a los resultados del examen escrito, ocurrieron los siguientes casos en que se suspendieron aspirantes con notas mucho más altas que otros aspirantes que fueron aprobados:

| Fecha Reválida | Suspendidos | Aprobados |
|---|---|---|
| Febrero 1961 | 68 | 54 |
| Septiembre 1960 | 81.5, 80 | 62.5 |
| Febrero 1959 | 65 | 51 |
| Febrero 1957 | 56.6 | 42.6 |
| Agosto 1956 | 48 | 28.6, 37.3 |
| Marzo 1956 | 64.6 | 44 |
| Julio 1946 | 73 | 42 |

en una fórmula simplista que se califica de "irrefutable"—número de aprobados en relación con el número de aspirantes examinados—que el porcentaje de aprobación bajo el nuevo sistema es de tan sólo 36.1% y el de suspensión es de 63.9%. Es preciso considerar la incidencia de los casos en que se trata del mismo aspirante que ha fracasado en varias ocasiones. Cuando para una evaluación justa y apropiada se analizan los resultados con la intervención de estos factores imprescindibles, el cuadro es completamente distinto, y lo que es más importante, es confiable. El verdadero porcentaje de aprobados es de 57.9% y el de suspendidos es de 42.1%. [2]

Penetrando más aun, se confirman los siguientes datos: Desde que se estableció el sistema de la junta permanente:

(1) han sido aprobados,

a) 234 graduados de la Universidad de Puerto Rico, de un total de 292, ó sea el 80.1%.

b) 81 graduados de la Universidad Interamericana, de un total de 172, ó sea el 47.1%.

c) 55 graduados de la Universidad Católica, de un total de 148, ó sea el 37.2%.

d) 3 graduados de universidades españolas, de un total de 32, ó sea el 9.4%.

(2) han aprobado en la primera ocasión en que han tomado el examen,

a) 184 graduados de la Universidad de Puerto Rico, de un total de 223, ó sea un 82.5%.

b) 54 graduados de la Universidad Interamericana, de un total de 82, ó sea un 65.9%.

c) 23 graduados de la Universidad Católica, de un total de 78, ó sea un 29.5%.

d) 0 graduados de universidades españolas, de un total de 6.

---

[2] Véase, Anexo A, cuadro 1.

(3) han aprobado en la segunda ocasión en que han tomado el examen,

a) 46 graduados de la Universidad de Puerto Rico, de un total de 59, ó sea un 78%.

b) 19 graduados de la Universidad Interamericana, de un total de 41, ó sea un 46.3%.

c) 23 graduados de la Universidad Católica, de un total de 41, ó sea un 56.1%.

d) 1 graduado de universidades españolas, de un total de 7.

(4) han aprobado en o después de la tercera ocasión en que han tomado el examen,

a) 4 graduados de la Universidad de Puerto Rico, de un total de 10, ó sea el 40%.

b) 8 graduados de la Universidad Interamericana, de un total de 49, ó sea el 16.3%.

c) 9 graduados de la Universidad Católica, de un total de 29, ó sea el 31.0%.

d) 2 graduados de universidades españolas, de un total de 19. ([3])

(5) De los 84 aspirantes que han fracasado en 3 ó más ocasiones,

a) 6 son graduados de la Universidad de Puerto Rico, ó sea un 7.2% del total.

b) 41 son graduados de la Universidad Interamericana, ó sea un 48.8%.

c) 20 son graduados de la Universidad Católica, ó sea un 23.8%.

d) 17 son graduados de universidades españolas, ó sea un 20.2%.

(6) La escuela de Derecho de la Universidad de Puerto Rico ha obtenido una puntuación promedio (111.9 puntos)

---

([3]) Véase, Anexo A, cuadro 2 y Anexo B.

que rebasa el límite fijado por este Tribunal para la aprobación de los aspirantes (108 puntos); no así las otras dos escuelas, que están catorce puntos bajo dicho límite. [4]

No puede escapar, pues, al más ingenuo que la calidad de la educación legal que están recibiendo los aspirantes en las escuelas de Derecho en Puerto Rico es un factor importantísimo, sino el más importante, para la determinación de las verdaderas causas del llamado problema de los frecuentes fracasos. ¿Cómo es posible en esas circunstancias eludir nuestra clara responsabilidad—derivada de la admisión incondicional en 1963 y 1964 de esos graduados al examen de reválida—y no preocuparnos porque se realice un estudio y reevaluación de la enseñanza en las escuelas de Derecho? No creo que constituya una justificación válida que puedan coexistir otros factores que en alguna medida influyan en los fracasos. Apuntar esta perogrullada sin señalar los factores específicamente es evadir la responsabilidad; es tratar de resolver un problema complejo con simplezas. Cualesquiera otros factores—atribuibles a los métodos y procedimientos de la Junta Examinadora—van a ser también objeto de escrutinio serio por una entidad cuya competencia se reconoce nacionalmente. [5] Y si hubieren otros factores, especifíquense.

Se ha afirmado además que no existen guías para el nombramiento por este Tribunal de los miembros que integran

---

[4] Véase, Anexo C.

[5] La siguiente resolución fue aprobada por el Tribunal:

"Con vista de la resolución adoptada por la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía el 20 de febrero de 1969 en el sentido de 'Solicitar de la Conferencia Nacional de Juntas Examinadoras que, tomando en consideración las circunstancias peculiares de Puerto Rico, realice un estudio y evaluación de los métodos y procedimientos utilizados por la Junta Examinadora Permanente de Aspirantes al Ejercicio de la Abogacía, tanto en cuanto a la preparación de las preguntas como a la corrección de las contestaciones de los exámenes y sobre cualquier otro aspecto relacionado con el funcionamiento de este organismo', el Tribunal acuerda solicitar de la Conferencia Nacional de Juntas Examinadoras que lleve a cabo el estudio y evaluación de referencia a la mayor brevedad posible."

la Junta Examinadora. La Regla 8 de nuestro Reglamento específicamente alude a abogados que tengan más de cinco años de experiencia en el ejercicio de la profesión, de reconocida capacidad, y que se hayan distinguido por su especial interés en la educación jurídica. (⁶) Para balancear la posibilidad de que el punto de vista práctico predomine en la preparación de los exámenes hemos adicionado tres miembros de la judicatura. La distribución por el Presidente de la Junta de las materias entre los examinadores para la formulación de las preguntas que se discuten y finalmente se aprueban es variada en todas las revalidas para evitar las posibles consecuencias de la especialización de algunos examinadores. Se han efectuado reajustes ponderados para eliminar el posible efecto en los resultados de un examinador demasiado exigente. ¿Qué más se pretende?

No he hecho juicios a priori sobre la competencia y eficiencia de las escuelas de Derecho. Frente a la situación que he descrito sólo cabe pensar que hay lugar para gran mejora-

(⁶) La Sección de Educación Legal de la Asociación Americana de Abogados recomienda la siguiente norma sobre el particular:

"1. *Qualifications*. A bar examiner should be a practicing attorney with scholarly attainments and an affirmative interest in legal education and requirements for admission to the bar.

"2. *Tenure*. A bar examiner should be appointed for a fixed term, but should be eligible for reappointment if his work is of high quality. Members of bar examining authorities should be appointed for staggered terms to insure continuity of policy, but there should be sufficient rotation in the personnel of each authority to bring new views to the authority and to insure continuing interest in its work.

"3. *Compensation*. The compensation, if any, which a bar examiner receives should not be directly dependent upon the number of persons taking the bar examinations.

"4. *Devotion to Duty*. A bar examiner should be willing and able to devote whatever time is necessary to perform the duties imposed upon him.

"5. *Essential Conduct*. A bar examiner should be conscientious, studious, thorough and diligent in learning the methods, problems and progress of legal education, in preparing bar examinations, and in seeking to improve the examination, its administration and requirements for admission to the bar. He should be just and impartial in recommending the admission of applicants. *He should exhibit courage, judgment and moral stamina in*

miento. Tanto la escuela de Derecho de la Universidad Interamericana como la de la Universidad Católica son instituciones jóvenes, en proceso de formación de una facultad, en pleno desarrollo de tradiciones y normas que hacen necesaria una continua revisión y evaluación.([7]) La Junta Examinadora de Aspirantes al Ejercicio de la Abogacía aspira a colaborar en esta revisión y evaluación para lograr profesionales competentes y capacitados.

—2—

Una vez más me veo obligado a tomar excepción del intento de macular la idoneidad de las personas que formaron parte del Comité de Acreditación de la Escuela de Derecho de la Universidad Interamericana. Antes, frente a la afirmación de que "no responde al mejor sentido de la creación de un cuerpo juzgador desinteresado e imparcial", dije, "La mejor contestación a esta manifestación sin fundamentos es indicar que del mismo formaban parte los licenciados Abrahám Díaz González y Manuel Abréu Castillo y los miembros del claustro universitario—tal cual lo exige la ley, repetimos —licenciados Lino J. Saldaña, José M. Canals y Margaret

---

*refusing to recommend applicants who lack adequate general and professional preparation or who lack good moral character.*

"6. *Adverse Influences, Conflicting Duties and Inconsistent Obligations.* A bar examiner should not have adverse influences, conflicting duties or inconsistent obligations which will in any way interfere or appear to interfere with the proper administration of his functions. A bar examiner should not participate directly or indirectly in courses for the preparation of applicants for bar admission nor act as a trustee of a law school or of a university of which a law school is a part or with which a law school is affiliated. A bar examiner should so conduct himself that there may be no suspicion that his judgment may be swayed by improper considerations."

([7]) En la inevitable comparación de los resultados entre las distintas escuelas debe considerarse que, en términos generales, los estudiantes admitidos por la Escuela de Derecho de la Universidad de Puerto Rico son los que mejor calificación han obtenido en los exámenes de ingreso que para ese fin se utilizan.

Hall." *In re Calderón Lassén*, 88 D.P.R. 931, 939 (1963). Ahora se tilda el informe de que no parece "lo objetivo y justo que debiera ser." Forzoso es reiterar lo que dije entonces sobre el particular. Añado que el hecho de que algunas de las personas que intervinieron en su preparación estuvieron vinculadas con la escuela de Derecho de la Universidad de Puerto Rico, como lo exigía la ley entonces vigente, Sec. 3 de la Ley Núm. 88 de 25 de abril de 1949, 18 L.P.R.A. sec. 803, no le resta objetividad. Me parece más apropiado que estos calificativos a personas que no pueden responder deben fundamentarse con hechos y no en meras conclusiones.

Finalmente, en adición a las razones que se aducen en la resolución, la integridad y honradez intelectual de todas las personas que componen el Consejo de Educación Superior son suficiente garantía para mí de que se descargará bien y fielmente la encomienda que le hemos solicitado.

En 9 de septiembre de 1964 voté a favor de la acreditación de la escuela de Derecho de la Universidad Católica. *In re Abréu Delgado*, 90 D.P.R. 911, 912 (1964). No me empecino en mis juicios ni pretendo justificarlos *ad infinitum* cuando se me demuestra que incidí. Si el estudio y evaluación que hemos solicitado demuestra que como medida extrema debe retirarse esta acreditación, presto estoy a rectificar. *Cf. Ex parte López*, 35 D.P.R. 162 (1926).

Estoy autorizado para indicar que los Jueces Asociados Señores Rigau, Ramírez Bages y Torres Rigual están conformes con el voto precedente; y que el Juez Asociado Señor Dávila concurre en el mismo.

APROBADOS Y SUSPENDIDOS, POR NUMERO DE VECES QUE TOMARON EL EXAMEN Y UNIVERSIDAD

REVALIDAS DE SEPTIEMBRE 1966 A SEPTIEMBRE 1968

Cuadro 1

| Número de Veces | Aprobados | Suspendidos | Total Examinados |
|---|---|---|---|
| 1 vez | 261 | 128 | 389 |
| 2 veces | 89 | 59 | 148 |
| 3 veces | 13 | 44 | 57 |
| 4 veces | 10 | 20 | 30 |
| 5 veces | | 20 | 20 |
| Total | 373 | 271 | 644 |
| Por ciento del Total | (57.9%) | (42.1%) | (100.0%) |

Cuadro
2

| UNIVERSIDAD | APROBADOS | | | | | | SUSPENDIDOS | | | | | | Gran Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Número de Veces | | | | | Total | Número de Veces | | | | | Total | |
| | 1era. | 2da. | 3ra. | 4ta. | 5ta. | | 1era. | 2da. | 3ra. | 4ta. | 5ta. | | |
| U. P. R. | 184 | 46 | 2 | 2 | - | 234 | 39 | 13 | 5 | 1 | - | 58 | 292 |
| Interamericana | 54 | 19 | 5 | 3 | - | 81 | 28 | 22 | 20 | 12 | 9 | 91 | 172 |
| Católica | 23 | 23 | 4 | 5 | - | 55 | 55 | 18 | 10 | 3 | 7 | 93 | 148 |
| España | - | 1 | 2 | - | - | 3 | 6 | 6 | 9 | 4 | 4 | 29 | 32 |
| Total | 261 | 89 | 13 | 10 | - | 373 | 128 | 59 | 44 | 20 | 20 | 271 | 644 |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

## RELACIÓN ENTRE APROBADOS Y SUSPENDIDOS, POR UNIVERSIDAD, CALIFICACIÓN Y VECES QUE TOMARON EL EXAMEN. REVÁLIDAS DE SEPTIEMBRE 1966 A SEPTIEMBRE 1968

| UNIVERSIDAD Y CALIFICACION | 1era. vez | | 2da. vez | | 3 veces o más | | Gran Total |
|---|---|---|---|---|---|---|---|
| | Número de Examinados | % del Total | Número de Examinados | % del Total | Número de Examinados | % del Total | Número de Examinados |
| **U. P. R.** | 223 | 100.0 | 59 | 100.0 | 10 | 100.0 | 292 |
| Aprobados | 184 | 82.5 | 46 | 78.0 | 4 | 40.0 | 234 |
| Suspendidos | 39 | 17.5 | 13 | 22.0 | 6 | 60.0 | 58 |
| **Interamericana** | 82 | 100.0 | 41 | 100.0 | 49 | 100.0 | 172 |
| Aprobados | 54 | 65.9 | 19 | 46.3 | 8 | 16.3 | 81 |
| Suspendidos | 28 | 34.1 | 22 | 53.7 | 41 | 83.7 | 91 |
| **Católica** | 78 | 100.0 | 41 | 100.0 | 29 | 100.0 | 148 |
| Aprobados | 23 | 29.5 | 23 | 56.1 | 9 | 31.0 | 55 |
| Suspendidos | 55 | 70.5 | 18 | 43.9 | 20 | 69.0 | 93 |
| **España** | 6 | | 7 | | 19 | | 32 |
| Aprobados | — | | 1 | | 2 | | 3 |
| Suspendidos | 6 | | 6 | | 17 | | 29 |
| **Todas** | 389 | 100.0 | 148 | 100.0 | 107 | 100.0 | 644 |
| Aprobados | 261 | 67.1 | 89 | 60.1 | 23 | 21.5 | 373 |
| Suspendidos | 128 | 32.9 | 59 | 39.9 | 84 | 78.5 | 271 |

Fuente de Información: Oficina del Tribunal Examinador de Abogados. T. S.

## CALIFICACIONES PROMEDIO, POR UNIVERSIDAD
## REVALIDAS DE SEPTIEMBRE 1966 A SEPTIEMBRE 1968

| UNIVERSIDAD | Septiembre 1966 | Marzo 1967 | Septiembre 1967 | Marzo 1968 | Septiembre 1968 | Todas |
|---|---|---|---|---|---|---|
| U. P. R. | 109.95 (87) | 114.58 (57) | 116.70 (90) | 114.21 (45) | 106.2 (94) | 111.9 (373) |
| Interamericana | 88.92 (54) | 97.00 (65) | 94.97 (69) | 100.05 (79) | 91.9 (76) | 94.7 (343) |
| Católica | 92.76 (46) | 103.08 (38) | 96.06 (59) | 93.61 (45) | 91.2 (81) | 94.6 (269) |
| Estados Unidos | 109.35 (11) | 110.00 (7) | 109.88 (8) | 96.13 (2) | 107.9 (4) | 108.6 (32) |
| España | 76.97 (15) | 77.79 (21) | 79.65 (21) | 85.59 (19) | 71.4 (21) | 78.2 (88) |
| Cuba | | | 111.00 (2) | | | |
| Total | 98.55 (213) | 103.11 (179) | 102.40 (249) | 100.39 (190) | 95.0 (276) | 99.8 (1105) |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

Nota: 1) 180 puntos es la puntuación total del examen
      2) Las cifras en paréntesis corresponden al número de examinados